Filed 12/10/24  Kilpatrick v. City of Los Angeles CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ROBERT L. KILPATRICK, Jr., | B327480 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. 22STCP01992) |
| CITY OF LOS ANGELES et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James C. Chalfant, Judge.  Reversed.

Hydee Feldstein Soto, City Attorney, Vivienne A. Swanigan and Jennifer Gregg, Assistant City Attorneys, for Defendants and Appellants.

Law Offices of Helena Sunny Wise and Helena S. Wise for Plaintiff and Respondent.

————————————————

Defendants the City of Los Angeles and Kristin M. Crowley (together, the City) appeal the trial court's judgment entered after it granted in part plaintiff Robert L. Kilpatrick's petition for writ of mandate.  Kilpatrick, a tenured firefighter, was relieved from duty without pay when he failed to sign an agreement to come into compliance with the City's COVID-19 vaccination policy, which was a condition of his employment.  Kilpatrick did not receive a hearing pursuant to *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 (*Skelly*) before he was relieved from duty.  The trial court found the City's actions violated Los Angeles City Charter section 1060, subdivision (b) (section 1060(b)), which provides that a firefighter may be temporarily relieved from duty pending a hearing before and decision by a Board of Rights on any pending charge or charges only after the City has followed "predisciplinary procedures otherwise required by law."  The court concluded the reference to "predisciplinary procedures" could only mean "*Skelly* requirements," and the City therefore violated section 1060(b) when it placed him off duty without pay prior to a December 21 *Skelly* hearing.

On appeal, the City contends section 1060(b) did not apply because there were no disciplinary charges pending against Kilpatrick when he was relieved of duty.  Alternatively, it contends section 1060(b)'s reference to predisciplinary procedures required by law does not necessarily mean a *Skelly* hearing.  The City argues the trial court's conclusion did not consider caselaw recognizing that in emergency situations a postdeprivation hearing may be sufficient to provide constitutionally adequate due process.  The City argues its predeprivation procedures did not deprive Kilpatrick of due process and section 1060(b) required nothing further.

2

We reject the City's contention that section 1060(b) did not apply to Kilpatrick's placement off duty without pay. But we agree the City's prediscipilinary procedures satisfied due process under the circumstances. We therefore reverse the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

*The City's Response to the COVID-19 Pandemic*

In March 2020, the Los Angeles City Council ratified the mayor's Declaration of Local Emergency related to the COVID-19 virus. The Declaration of Local Emergency was renewed through December 2022. In July 2021, the mayor issued a directive requiring all City department heads to verify and track the COVID-19 vaccination status of City employees. The mayor also directed the development of an implementation plan for a vaccination program covering all City employees. In August 2021, the City Council adopted Ordinance No. 187134 (the Ordinance), which required all City employees to report their vaccination status by October 19, 2021, and to be fully vaccinated or request an exemption by October 20, 2021. These vaccination and reporting requirements became conditions of employment for all City employees on October 20, 2021. Exemptions to the vaccine mandate were available to accommodate medical conditions or restrictions and sincerely held religious beliefs. Employees who obtained an exemption were subject to weekly testing paid for by the City.

On October 14, 2021, the Office of the City Administrative Officer released the City's Last, Best and Final Offer (LBFO) regarding consequences for City employees who had not complied with the vaccine mandate. Under the LBFO, the City would issue notices to employees who failed to obtain a vaccination by the October 20, 2021 compliance deadline and had not requested

3

an exemption.  The notice would grant such employees until December 18, 2021, to comply with the vaccination requirement if they signed the notice and agreed to its terms.  The extension was subject to certain other conditions, including the employees' participation in twice-weekly testing at their own expense.

According to the LBFO, failure to sign the notice "shall constitute failure to meet a condition of employment and shall result in appropriate and immediate corrective action." Employees who failed to show proof of full vaccination by December 18, 2021, would be subject to involuntary separation from City employment for failure to meet a condition of employment.  Those with pending exemption requests would be exempt from vaccination until their request was approved or denied.  Employees whose exemptions were denied, or denied after an appeal, would also receive additional time to become vaccinated.

The City Council adopted a resolution instructing the mayor to implement the LBFO and reaffirm the declaration of a public health emergency.  The mayor issued a memorandum directing all department heads to implement the LBFO.

### Termination of Kilpatrick's Employment

Kilpatrick was a tenured firefighter with 34 years of service in the Los Angeles Fire Department (LAFD).  He held the rank of battalion chief.  Kilpatrick was one of 367 LAFD firefighters the City had designated as not vaccinated on October 20, 2021, and determined to actually be unvaccinated.  Consistent with the LBFO, on November 9, 2021, the City provided Kilpatrick a notice, which informed him that he was not in compliance with the condition of employment that he be vaccinated for COVID-19 (the Notice).  The Notice provided Kilpatrick at least 48 hours to

4

either show he had complied with the vaccine mandate, or agree that he would comply by December 18, 2021, and to demonstrate that agreement by signing the Notice. Kilpatrick did not sign the Notice. On November 12, 2021, the City placed him off duty without pay for failure to meet a condition of his employment.

At that point, Kilpatrick had not filed any request for a religious or medical exemption. On November 30, 2021, the City made Kilpatrick aware that he was the subject of an investigation by LAFD's Professional Services Division (PSD). On December 13, 2021, an internal affairs complaint regarding Kilpatrick was sent to the PSD.

On December 15, 2021, the City provided Kilpatrick with a "Proposed Board of Rights," informing him of a *Skelly* hearing scheduled for December 21, 2021. A virtual hearing took place on December 21, 2021. Kilpatrick left the hearing after the City refused to produce materials he requested.

On January 5, 2022, the City served Kilpatrick with a notarized notice of the charge against him of failing to meet a condition of employment by failing to comply with the vaccine mandate as of October 20, 2021. On February 8, 2022, Kilpatrick and LAFD selected the members for his Board of Rights. On February 9, 2022, the City provided Kilpatrick with a "Notification of Temporary Relief from Duty" signed by the fire chief, stating: "For failure to meet a condition of employment as set forth in [Ordinance No. 187134], by failing to comply with the City's COVID-19 Vaccination Requirement, set forth in the Ordinance . . . ."

The City notified Kilpatrick of the date and time of his Board of Rights hearing, scheduled for February 17, 2022. Kilpatrick did not appear at the hearing. The special

5

investigator informed the board that under City Charter section 1060, subdivision (h), failure to appear at the hearing permitted the fire chief to direct the Board of Rights to proceed with a hearing in the absence of the accused or, without a hearing, impose the penalty of suspension or removal. The board elected to continue the hearing to March 2, 2022. It requested that all witness lists, motions, and stipulations be submitted by February 24, 2022. Kilpatrick was given notice of the continued Board of Rights hearing.

On February 28, 2022, Kilpatrick sent an e-mail to LAFD's Personnel Services Section and others stating he had a " 'truly held religious belief/conviction that prevents [him] from getting the COVID-19 vaccine.' " LAFD responded that Kilpatrick was relieved from duty pending the March 2 hearing before the Board of Rights. On March 2, Kilpatrick submitted a "Request for Religious Exemption Form" to LAFD's Personnel Services Section.

Kilpatrick did not appear at the Board of Rights hearing convened on March 2. No evidence was presented on his behalf at the hearing. In light of his nonappearance, the fire chief imposed the penalty of removal and dissolved the Board of Rights. On March 3, 2022, the fire chief signed a Fire Chief's Notice of Removal. Kilpatrick was removed from his position based on this action, effective February 8, 2022. On March 11, Kilpatrick submitted an "Appeal from Discharge" to the Office of the Fire Commission. He received no response. On March 24, 2022, Kilpatrick applied for a service pension. His application was granted the same day.

***The Underlying Proceedings***

On May 25, 2022, Kilpatrick filed a petition for peremptory writ of mandate against the City overturning his termination and restoring his position as LAFD Battalion Chief. In his memorandum of points and authorities in support of the petition, Kilpatrick argued, among other things, that the City violated section 1060(b), which "provides that a tenured employee such as Kilpatrick has the right to hold his position and receive the compensation attached to that position until and unless he is found guilty of charges after a hearing before a Board of Rights." Kilpatrick asserted the City unlawfully removed him from his position without pay on November 12, 2021, months before his employment was terminated. In response, the City argued that its *Skelly* process under the then-existing emergency circumstances satisfied its obligations under the law. Citing *Mitchell v. State Personnel Bd.* (1979) 90 Cal.App.3d 808, 813, it argued the *Skelly* decision " 'evolved from a nonemergency situation' and thus is not direct authority for the issue presented here, involving an unprecedented public health emergency due to COVID-19."

In its tentative decision, the trial court rejected most of Kilpatrick's contentions. It concluded Kilpatrick's remedy to contest his discharge for failure to meet a condition of employment was through a Board of Rights Hearing and he failed to exhaust his administrative remedies by declining to appear at either opportunity. It further concluded that Kilpatrick, a now-retired former employee, lacked standing to challenge the City's requirement that unvaccinated employees bear the cost of twice weekly testing as illegal under Labor Code section 2802.

However, the court concluded Kilpatrick's relief from duty was proper only so long as it took place " 'following predisciplinary procedures otherwise required by law,' " and that this "can only mean *Skelly* requirements."  The court rejected the City's contention that a *Skelly* hearing was not initially required when Kilpatrick was relieved from duty without pay and that its *Skelly* process satisfied the City's obligations pending the full hearing.  The court concluded Kilpatrick was entitled to backpay for the period of November 12 until December 21, 2021.

Following a hearing, the trial court adopted its tentative ruling.  The court entered judgment on February 16, 2023.  The City timely appealed.[1]

---

[1]    Kilpatrick argues on appeal that the *Skelly* and Board of Rights hearings were "infirm" and he should have been awarded backpay through his date of retirement, "March 9, 2022, or at least February 8, 2022[,] when a Board of Rights was selected." However, he did not file a cross-appeal.  "As a general matter, ' "a respondent who has not appealed from the judgment may not urge error on appeal." ' [Citation.]  'To obtain affirmative relief by way of appeal, respondents must themselves file a notice of appeal and become cross-appellants.' [Citation.]" (*Preserve Poway v. City of Poway* (2016) 245 Cal.App.4th 560, 585.)  We do not consider any of Kilpatrick's claims that the trial court erred for reasons unrelated to those raised in the City's appeal, including regarding the calculation of the backpay period. (*Building Industry Assn. v. City of Oceanside* (1994) 27 Cal.App.4th 744, 758, fn. 9.)  Kilpatrick does not, and cannot, contend that review of the trial court's calculation of the backpay issue is necessary to determine whether any error by the trial court was prejudicial to the City.  (Code Civ. Proc., § 906.)

## DISCUSSION

## I. Kilpatrick's Requests for Judicial Notice and to Augment the Record Are Denied

As a preliminary matter, we address Kilpatrick's requests for judicial notice and to augment the record. We deny both requests, which seek to introduce into the record materials that could have been submitted to the trial court but were not, post-date the trial court proceedings, or are irrelevant to the discrete issues before us in the City's appeal.

### A. Judicial notice is not warranted

Kilpatrick asks this court to take judicial notice of five exhibits: (1) the unpublished appellate decision in *FireFighters4Freedom v. City of Los Angeles* (June 21, 2023, B320569) (*FireFighters4Freedom*); (2) an Official Action of the Los Angeles City Council, dated February 14, 2023, discontinuing COVID-19 surveillance testing requirements implemented pursuant to Ordinance No. 187134; (3) Impartial Arbitrator's Findings and Award in ERB Case No. ARB 4035, dated November 21, 2023; (4) an adopted Public Safety Committee report and Ordinance related to a prohibition against the registration of individuals based on religion, dated May 23, 2018; and (5) Los Angeles Times and other press coverage regarding LAFD, consisting of five articles dated May 4, 2023, May 6, 2023, March 16, 2022, November 20, 2022, and January 31, 2023.

"Although, 'as a "reviewing court" (Evid. Code, § 459, subd. (a)), we *must* take judicial notice of some matters (*id.*, § 451) and *may* take judicial notice of others (*id.*, § 452), . . . a precondition to the taking of judicial notice in either its mandatory or permissive form' is that 'any matter to be judicially noticed must be relevant to a material issue.' [Citations.]"

(*Mireskandari v. Gallagher* (2020) 59 Cal.App.5th 346, 359, fn. 11.) " 'Reviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances. [Citation.] 'It is an elementary rule of appellate procedure that, when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered. [Citation.] This rule preserves an orderly system of [litigation] by preventing litigants from circumventing the normal sequence of litigation.' [Citation.]" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2.)

In addition, "[t]he court's power to accept new evidence on appeal should not be exercised when the appellant has failed to show good cause for the unavailability of the evidence in the trial court." (*Tsakos Shipping & Trading, S.A. v. Juniper Garden Town Homes, Ltd.* (1993) 12 Cal.App.4th 74, 87.) "It would undermine basic principles of appellate review to include within the scope of our review matters that a party perhaps should have, but did not, offer to the trial court in the first instance in making the ruling now challenged on appeal." (*Glassman v. Safeco Ins. Co. of America* (2023) 90 Cal.App.5th 1281, 1307.) "Further, even if a reviewing court takes judicial notice of documents, it is not for the truth of matters asserted therein . . . ." (*Ibid.*; accord, *Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1141, fn. 6 ["[t]he truth of the content of [newspaper] articles is not a proper matter for judicial notice"]; *Hill v. San Jose Family Housing Partners, LLC* (2011) 198 Cal.App.4th 764, 770 [even if city resolution were relevant, court "could take judicial notice only that the document exists, not of the truth of its contents"]; *O'Neill v. Novartis Consumer Health, Inc.* (2007) 147 Cal.App.4th 1388,

1405 ["A court may take judicial notice of a court's action, but may not use it to prove the truth of the facts found and recited."].)

Kilpatrick does not contend Evidence Code section 451 requires us to take judicial notice of any of the materials he has submitted. He appears to offer the documents for the truth of their contents, of which we cannot take judicial notice. The unpublished decision *FireFighters4Freedom*, *supra*, B320569, the May 2018 City Council action, and the newspaper articles are also irrelevant to the discrete issue before us on the City's appeal: whether the City violated section 1060(b) by placing Kilpatrick off duty without pay prior to the December 21, 2021 *Skelly* hearing. The February 2023 council action discontinuing mandatory testing for unvaccinated employees is also not relevant. Kilpatrick fails to establish how the discontinuation of the COVID-19 testing program over a year after he was relieved from duty without pay informs whether the City violated section 1060(b) as of November 2021.

The May 23, 2018 ordinance was available at the time of the proceedings below and Kilpatrick cites no evidence that he sought to admit it, nor does he explain why he could not have done so. Similarly, three of the news articles predate the judgment in this case. Kilpatrick offers no explanation as to why the articles were not and could not have been submitted to the trial court. The remaining two articles postdate the judgment and thus could not have formed part of the trial record. The unpublished opinion in *FireFighters4Freedom*, *supra*, B320569, and the Impartial Arbitrator's Findings and Award were also issued after the court entered judgment in this case. The trial court could not have considered either decision when it made its ruling. We additionally note that California Rules of Court,

11

rule 8.1115(a) prohibits a court or party from citing or relying on unpublished California Court of Appeal decisions. The rule is subject to only two exceptions, neither of which is applicable here. (Cal. Rules of Court, rule 8.1115(b).)

For the foregoing reasons, we deny the requests for judicial notice.

**B.      Kilpatrick fails to identify exceptional circumstances authorizing this court to make findings of fact**

Kilpatrick also filed a motion to augment the record with 39 pages of his correspondence with LAFD. "Augmentation does not function to supplement the record with materials not before the trial court." (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3; see also *Lewis v. YouTube, LLC* (2015) 244 Cal.App.4th 118, 124 (*Lewis*) [Cal. Rules of Court, "rule 8.155 authorizes the supplementation and correction of the appellate record to include only those documents that were part of the trial court's record"].) " 'Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and rule 23 of the California Rules of Court, the authority should be exercised sparingly. [Citation.] *Absent exceptional circumstances, no such findings should be made.* [Citation.]' [Citations.]" (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; accord, *In re Dezi C.* (2024) 16 Cal.5th 1112, 1150–1151.) Courts have further ruled that "this authority may be exercised only . . . [where] the evidence arose after judgment or was unavailable to the movant before judgment [citation]; and [the] evidence supports the affirmance of the trial court's judgment [citation]." (*Lewis*, at p. 123.)

Kilpatrick's belief that the communications are relevant to rebut arguments the City has made on appeal is not an exceptional circumstance, particularly as he concedes the correspondence was available to him before the trial court issued its judgment. (*Bombardier Recreational Products, Inc. v. Dow Chemical Canada ULC* (2013) 216 Cal.App.4th 591, 605 ["no exceptional circumstances exist to justify making factual determinations" where "the additional evidence could have been submitted timely but was not"].) Accordingly, Code of Civil Procedure section 909 does not authorize us to grant Kilpatrick's motion.

Since the record on appeal does not contain the materials described in Kilpatrick's request for judicial notice or request to augment, we disregard the portions of his respondent's brief that rely on these materials. (See *Lewis*, *supra*, 244 Cal.App.4th at p. 124.)

## II. The Court Did Not Err in Concluding Section 1060(b) Applied to Kilpatrick's Placement Off Duty Without Pay

The City contends the trial court erred in finding that section 1060(b) governed the City's act of relieving Kilpatrick of duty. It argues that no disciplinary charges were pending against Kilpatrick until December 15, 2021. We disagree with the City's interpretation of section 1060(b) as inconsistent with the provision's plain language and ostensible purpose.

### A. Applicable legal principles

Code of Civil Procedure section 1094.5 provides for judicial review of administrative orders or decisions. A petition for writ of administrative mandate presents the question of whether the agency or tribunal that issued the challenged decision "proceeded

13

without, or in excess of, jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion." (*Id.*, subd. (b).) "Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid.*) "If the administrative decision substantially affects a fundamental vested right, the trial court must exercise its independent judgment on the evidence." (*Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305, 313.)

On appeal, "[o]ur task is to review the record and determine whether the *trial court's* findings (not the administrative agency findings) are supported by substantial evidence. [Citations.] We resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision." (*Candari v. Los Angeles Unified School Dist.* (2011) 193 Cal.App.4th 402, 407–408.) "However, 'we make an independent review of any questions of law necessary to the resolution of this matter on appeal' [citation], including the interpretation of rules of law, and whether the procedures comported with due process [citation]." (*Thornbrough v. Western Placer Unified School Dist.* (2013) 223 Cal.App.4th 169, 179.) "The interpretation of a statute and the application of a statute to undisputed facts are legal issues subject to de novo review. [Citations.] In reviewing questions of law, we review the trial court's ruling and are not bound by the trial court's stated reasons or rationales." (*Earnest v. Commission on Teacher Credentialing* (2023) 90 Cal.App.5th 62, 73–74.)

"The principles of construction that apply to statutes also apply to the interpretation of charter provisions. [Citation.] 'In

14

construing a provision adopted by the voters our task is to ascertain the intent of the voters.' [Citation.] 'We look first to the language of the charter, giving effect to its plain meaning. [Citation.] Where the words of the charter are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the charter or from its legislative history.' [Citation.]" (*Don't Cell Our Parks v. City of San Diego* (2018) 21 Cal.App.5th 338, 349 (*Don't Cell Our Parks*).) " 'When statutory language is susceptible of more than one reasonable interpretation, courts should consider a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history including ballot pamphlets, public policy, contemporaneous administrative construction and the overall statutory scheme.' [Citation.]" (*Ibid*.) "A 'charter city may not act in conflict with its charter' [citation] and '[a]ny act that is violative of or not in compliance with the charter is void.' [Citation.]" (*Ibid*.)

### B. The trial court's conclusion was consistent with the plain language of section 1060(b)

Section 1060(b) provides in part: "After following predisciplinary procedures otherwise required by law, the fire chief may: [¶] (1) temporarily relieve from duty any member pending a hearing before and decision by a Board of Rights on any charge or charges pending against the member . . . ." City Charter section 1060, subdivision (a), defines "member" as "all officers and firefighters of the Fire Department."

The trial court concluded "Kilpatrick's failure to sign the Notice stating that he would comply with the vaccination mandate or file an exemption by December 18, and that he would submit to the required testing in the interim, was the reason why

15

he was placed off duty on November 12, 2021 without pay for failure to meet a condition of employment." The court determined "[t]his cannot be described reasonably as anything other than relief from duty under City Charter section 1060(b)."

The City argues that the court's focus solely on whether Kilpatrick was relieved from duty renders the "pre-disciplinary" and "charges pending" language surplusage. It contends that section 1060(b)'s reference to "predisciplinary procedures" means that any charge against the member must be disciplinary in nature for this subdivision to apply. Further, the City asserts that because "pending" means " '[begun], but not yet completed; during, before the conclusion of; prior to the completion of; unsettled; undetermined; in [the] process of settlement or adjustment' " (*McAlpine v. Superior Court* (1989) 209 Cal.App.3d 1, 6), the language of the subdivision indicates the City must have initiated disciplinary charges for section 1060(b) to apply. The City contends that although LAFD removed Kilpatrick from duty without pay on November 12, 2021, the City did not initiate "disciplinary charges" against him until December 15, 2021, and, until that time, he still had the option to comply with the condition of employment.

Accepting for the sake of argument the City's contention that section 1060(b) applies only when a member is relieved from duty *and* there are already disciplinary charges pending, the City's argument is still unavailing for two reasons. First, the City offers no specific definitions of "charge" or "disciplinary," yet asserts without reference to the City Charter, any statute, or any other source, that the Notice did not initiate "disciplinary charges," but the December 15, 2021 Proposed Board of Rights notification did.

16

The City Charter does not define the terms "charge" or "discipline." The plain meaning of "charge" in this context is "an accusation of a wrong or offense." (Merriam-Webster Unabridged Dict. Online (2024) <https://unabridged.merriam-webster.com/unabridged/charge> [as of Dec. 10, 2024], archived at <https://perma.cc/PRL5-XTW9>.) The plain meaning of "discipline" is "punishment by one in authority especially with a view to correction or training." (Merriam-Webster Unabridged Dict. Online (2024) <https://unabridged.merriam-webster.com/unabridged/discipline> [as of Dec. 10, 2024], archived at <https://perma.cc/Y9FH-PMW6>.)

The trial court found the Notice informed Kilpatrick "that he had not complied with the [COVID-19 vaccine] mandate as a condition of employment and that he had 48 hours to submit evidence that he either had or was taking steps to comply." This was the accusation of a wrong, and it warned of punishment or correction if Kilpatrick did not comply. As described in the record, the December 15 notice was titled " 'Proposed Board of Rights' " and indicated Kilpatrick was not entitled to a formal hearing, but he had the right to respond to and present any additional information to rebut the charges against him at a *Skelly* hearing scheduled for December 21, 2021.[2] While the "Proposed Board of Rights" suggests a disciplinary action further along the path to termination of employment than the Notice, the

---

[2] The City's citations to the Notice and the December 15 "Proposed Board of Rights" are to descriptions of these documents made in declarations below, not to the documents themselves. It appears that neither document was included in the record on appeal. Thus, we rely on the trial court's descriptions of these documents.

City concedes nothing in the City Charter describes the form a "charge" must take to fall under section 1060(b). And even if the City had established that the form the charges take has any significance under section 1060(b), the City identifies no language in the Notice that significantly distinguishes it from the December 15 notice in terms of informing Kilpatrick that he was out of compliance with a condition of employment and would face adverse consequences.

Second, the record belies the City's contention that the charges against Kilpatrick were not "disciplinary" because he had the opportunity to come into compliance with the vaccine mandate before December 18. It is undisputed that Kilpatrick had only 48 hours from receiving the Notice to indicate his compliance or agreement to comply with the vaccine mandate. Kilpatrick did neither. The LBFO provided that *failure to sign the Notice* or to comply with its terms "shall constitute failure to meet a condition of employment and shall result in appropriate and immediate corrective action." The extended period of time to comply with the vaccine mandate applied only to "an employee who is not fully vaccinated *and who has agreed to the terms of the Notice*." (Italics added.) As the October 28 memorandum from the mayor's office explained, "If the employee refuses to sign the notice, then the employee shall be placed off duty without pay pending service of a *Skelly* package that includes a Notice of Proposed Separation."

Thus, even if the accusation in the Notice was not yet disciplinary for those employees who accepted the opportunity to come into compliance with the conditions of employment by December 18, 2021, the City fails to explain how the charge was not yet disciplinary for employees like Kilpatrick who did *not*

18

agree to the terms of the Notice and were in fact subjected to "immediate corrective action" as set forth in the LBFO. The record does not support the City's implicit claim that an employee who did not consent to the terms of the Notice within the time the City allotted could simply change his or her mind at any point prior to December 18, 2021, and achieve compliance. The LBFO required employees to complete several time-sensitive tasks, including twice-weekly COVID-19 testing and obtaining a final vaccination shot 14 days prior to December 18. Thus, the LBFO's terms indicated the Notice would initiate two pathways—an extension for employees who signed the Notice, and the imposition of immediate corrective action and further discipline for those who did not.

In sum, the trial court did not err in concluding that section 1060(b) became applicable when the City placed Kilpatrick off duty without pay after the expiration of the 48-hour period to respond to the Notice for failure to meet a condition of employment. The City fails to demonstrate that this reasoning was flawed because Kilpatrick was not yet subject to "disciplinary charges," a term the City does not precisely define or support with documentation in the record. City Charter section 1060, subdivision (a), expressly states that "[t]he right of a member of the Fire Department . . . to hold his or her office or position and to receive compensation attached to the office or position is hereby declared to be a substantial property right of which the holder shall not be deprived arbitrarily or summarily . . . ." Interpreting section 1060(b) in the way the City suggests would permit it to deny members a substantial property right without complying with any predisciplinary procedures, based on arbitrary and narrow readings of "charge" and "disciplinary" that

19

are unsupported by the language of the City Charter.  This is at odds with the plain language of City Charter section 1060 and the "ostensible objects" it is intended to achieve.  (*Don't Cell Our Parks*, *supra*, 21 Cal.App.5th at p. 349.)

III.  **The Trial Court Erred in Concluding that Section 1060(b) Required a Predeprivation *Skelly* Hearing**

Although we have concluded section 1060(b) applied, the City has additionally appealed on the issue of what procedures section 1060(b) required.  The City challenges the trial court's conclusion that "predisciplinary procedures otherwise required by law" under section 1060(b) meant a full *Skelly* hearing.

A.  **Applicable legal principles**

The government cannot deprive individuals of a " 'property' interest" within the meaning of the due process clause of the Fourteenth Amendment to the United States Constitution without procedural due process.  (*Mathews v. Eldridge* (1976) 424 U.S. 319, 332 (*Mathews*).)  A procedural due process claim has three elements: "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; (3) lack of process."  (*Portman v. County of Santa Clara* (9th Cir. 1993) 995 F.2d 898, 904.)

"Our Supreme Court found in *Skelly*, '[T]he California statutory scheme regulating civil service employment confers . . . "permanent employee[s]" [with] a property interest in the continuation of [their] employment [that] is protected by due process.' [Citation.]  Before such an employee may be subject to an adverse employee action, due process requires, at a minimum, 'notice of the proposed action, the reasons therefor, a copy of the charges and materials upon which the action is based, and the

20

right to respond, either orally or in writing, to the authority initially imposing discipline.' [Citation.]" (*LaMarr v. Regents of University of California* (2024) 101 Cal.App.5th 671, 675; *Skelly*, *supra*, 15 Cal.3d at p. 215.)  However, *Skelly* does not require that a predeprivation *evidentiary hearing* take place.  (*Skelly*, at p. 215 ["due process does not require the state to provide the employee with a full trial-type evidentiary hearing prior to the initial taking of punitive action"]; see also *Cleveland Board of Education v. Loudermill* (1985) 470 U.S. 532, 546 ["The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story."].)  The "hearing" need only serve as "an initial check against mistaken decisions— essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." (*Cleveland Board of Education*, at pp. 545–546.)

*Skelly* considered the validity of a statutory scheme that allowed a public employee to be dismissed or disciplined without any advance notice.  (*Skelly*, *supra*, 15 Cal.3d at p. 202.)  The court rejected the scheme as providing insufficient due process. Although the employer defendants argued "emergency circumstances may arise in which the immediate removal of an employee is essential to avert harm to the state or to the public," the *Skelly* court noted the statute in question was not limited to such situations and the case before it presented "an example of the statute's operation in a situation requiring no special protection of the state's interest in prompt removal." (*Id.* at p. 216.)

21

Subsequent cases have considered procedural due process principles in other circumstances. " 'It is by now well established that " '[d]ue process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." [Citation.] "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." [Citation.] [The United States Supreme] Court has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.' [Citation.] ' "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." ' [Citation.]" (*Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 112–113 (*Bostean*); accord, *Gilbert v. Homar* (1997) 520 U.S. 924, 930 (*Gilbert*) [" 'we have rejected the proposition that [due process] *always* requires the State to provide a hearing prior to the initial deprivation of property' "].)

"[T]o determine what process is constitutionally due, 'we have generally balanced three distinct factors: [¶] "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." [Citation.]' [Citation.]" (*Bostean*, *supra*, 63 Cal.App.4th at p. 113.) We review de novo questions of law involving the due process clause. (*Id.* at pp. 107–108.)

**B. The City's process was adequate to ensure that the deprivation of Kilpatrick's property interests was not unwarranted**

The trial court concluded the "reference to '[predisciplinary] procedures' [in section 1060(b)] can only mean *Skelly* requirements."  The court accordingly determined Kilpatrick was entitled to backpay from the date he was placed off duty through December 21, when the full *Skelly* hearing took place.[3]  However, as set forth above, courts after *Skelly* have acknowledged that an important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may justify postdeprivation process.  (*Gilbert*, *supra*, 520 U.S. at p. 930; *Bostean*, *supra*, 63 Cal.App.4th at pp. 112–113.)  As the City points out, legislators are "presumed to be aware of ' "judicial decisions already in existence, and to have enacted or amended a statute in light thereof.  [Citation.]" ' [Citation.]" (*People v. Giordano* (2007) 42 Cal.4th 644, 659.)  The current City Charter was affirmed effective July 2000.  We presume the voters were aware of the developments in the law when referring to "predisciplinary procedures otherwise required by law."  Thus, contrary to the trial court's conclusion that a predisciplinary hearing or meeting was necessarily required, we must look to

---

[3]      On appeal, the City describes the pre-suspension process as a "modified *Skelly* procedure" that was adequate to satisfy due process requirements, but it does not contend the process met the actual requirements set forth in *Skelly*.  The trial court did not expressly consider the extent to which the City's pre-suspension process satisfied *Skelly* requirements, but implicitly concluded it fell short.  We assume without deciding that the Notice and related pre-suspension procedure did not satisfy all *Skelly* requirements.

23

both *Skelly* and subsequent caselaw in evaluating what predisciplinary procedures due process required.

We first consider the private interest affected. City Charter section 1060, subdivision (a), provides that "[t]he right of a member of the Fire Department . . . to hold his or her office or position and to receive compensation attached to the office or position is hereby declared to be a substantial property right . . . ." (See also *Bostean, supra*, 63 Cal.App.4th at p. 113 ["[A]n employee has a 'significant private interest in the uninterrupted receipt of his paycheck' [citation] . . . ."].) Where an employee is deprived of his paycheck prior to a hearing, "the interest affected by state action . . . is significant, weighing heavily in favor of a predeprivation hearing if there is no countervailing state interest warranting immediate action." (*Id.* at p. 113.) However, the United States Supreme Court has "also emphasized that in determining what process is due, account must be taken of 'the *length*' and '*finality* of the deprivation.' [Citation.]" (*Gilbert, supra*, 520 U.S. at p. 932.) "So long as [a] suspended employee receives a sufficiently prompt postsuspension hearing, the lost income is relatively insubstantial (compared with termination), and fringe benefits such as health and life insurance are often not affected at all, [citation]." (*Ibid.*)

It is unclear from the record whether and to what extent Kilpatrick's benefits were affected. Although we will assume the deprivation was not insubstantial, we observe that it was not final and was of a relatively limited duration. (See *FDIC v. Mallen* (1988) 486 U.S. 230, 243 [holding that 90 days before the agency hears and decides the propriety of a suspension does not exceed the permissible limits where coupled with factors that

24

minimize the risk of an erroneous deprivation].)  Moreover, under City Charter section 1060, subdivision (t), Kilpatrick was "entitled to receive full compensation from the City as if the suspension or removal had not been made" if the City ultimately restored him to duty.

Still, accepting Kilpatrick's substantial interest in continued employment and pay, we conclude that the deprivation was justified by a countervailing state interest warranting immediate action.  A public employer's power to declare an emergency is "plainly a discretionary one."  (*Sonoma County Organization etc. Employees v. County of Sonoma* (1991) 1 Cal.App.4th 267, 274.)  " ' "In the absence of evidence to the contrary it will be assumed that a municipal legislative body in enacting an emergency ordinance acted on sufficient inquiry as to whether an emergency existed.  Its declaration is prima facie evidence of the fact.  Where the facts constituting the emergency . . . are recited in the ordinance and are such that they may reasonably be held to constitute an emergency, the courts will not interfere, and they will not undertake to determine the truth of the recited facts." [Citation.]' [Citations.]" (*Id.* at p. 275.)  "[T]he general judicial attitude [towards emergency ordinances] is one of pronounced deference to the legislative decision."  (*Id.* at p. 276; cf. *Crown Motors v. City of Redding* (1991) 232 Cal.App.3d 173, 179 ["While a city council's determination the declaration of facts is sufficient to constitute an urgency may be reviewed by the courts, courts normally will not investigate the truth of the facts declared by the city council."].)

Under Los Angeles Administrative Code section 8.27, the mayor is empowered to declare the existence of a local emergency

when he or she finds the existence of a situation of a magnitude that is likely to become beyond the control of the normal services, personnel, equipment and facilities of the regularly constituted branches and departments of the City government, or when a disaster or local emergency is declared by the President of the United States or the Governor of California. Following the preparation of a resolution ratifying the existence of a local emergency, the Los Angeles City Council must approve or disapprove the resolution within seven days from the date of the original declaration by the mayor and must re-approve it periodically thereafter. In March 2020, the City Council timely ratified the mayor's declaration of local emergency. The City remained in a state of local emergency due to the COVID-19 pandemic until December 2022.

In the resolution implementing the LBFO, the City set forth three pages of recitals describing the ratification and renewal of the declaration of local emergency, the exercise of emergency authority "in furtherance of the ongoing need to preserve life and property of individuals living and working in the City," the ongoing nature of the COVID-19 pandemic, and the negotiation process that led to the Ordinance and the LBFO. In the recitals, the City stated that it "would be subjected to a significant financial burden if it had to provide a weekly testing option for all unvaccinated City employees, or place all unvaccinated City employees on paid leave, while simultaneously paying overtime to cover staffing shortages resulting from their absence." The City Council resolved that an emergency existed; the City could not "wait for exhaustion of collective bargaining impasse procedures . . . to address the imminent threat to public health and safety and workplace safety posed by allowing

unvaccinated City employees to remain in the workplace and to continue to interact with the public and other City employees"; the COVID-19 pandemic had "created a catastrophic public health emergency beyond the City's control sufficient to excuse the City from its normal duty to complete the meet and confer process prior to acting on its decision to impose consequences for non-compliance" with the vaccine mandate; and there was "a compelling need for such unilateral action to protect public health and safety and workplace safety."

In the trial court, Kilpatrick did not challenge the City's decision to declare a state of emergency or the emergency resolution implementing the LBFO. The trial court indicated that while "there was an emergent situation and the City's policy choice was that non-compliant City employees could not remain in the workplace," there "is no reason why the City could not have paid Kilpatrick until it could hold a *Skelly* meeting." Yet, this disregards that Kilpatrick was one of potentially thousands of employees who were non-compliant with the conditions of their employment due to their failure to accept the terms of the LBFO.[4] The City had determined that placing all such employees on paid leave would put it under a significant financial burden and "compromise [its] ability to meet its ongoing financial obligations and adequately provide essential public services to the public." There was no evidence in the record contradicting the City's findings in the resolution implementing the LBFO.

---

[4] The resolution implementing the LBFO indicated that as of October 18, 2021, over 14,000 employees had reported their status as unvaccinated or "decline to state," or had failed to report their status.

"'Financial cost alone is not a controlling weight in determining whether due process requires a particular procedural safeguard prior to some administrative decision. But the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed. At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost.'" (*Duncan v. Department of Personnel Administration* (2000) 77 Cal.App.4th 1166, 1183 (*Duncan*), quoting *Mathews*, *supra*, 424 U.S. at p. 348.)

In *Duncan*, the court observed that "in a time of financial crisis, the State has a significant interest in taking quick steps to resolve its economic woes" and that, while "provid[ing] a predeprivation hearing for a single employee" is "one thing . . . [i]t is quite another to require the State to conduct pre-layoff hearings for 95 employees in the midst of a financial crisis." (*Duncan*, *supra*, 77 Cal.App.4th at pp. 1182, 1183.) Similarly, in this case, the analysis of the City's interests cannot focus only on what would have been reasonable with respect to a single employee, since the undisputed evidence indicated the City faced an emergency situation involving many employees.

The City's strong interest in taking immediate action based on the COVID-19 pandemic and its fiscal limitations are not determinative, however. These considerations must be balanced against the risk of an erroneous deprivation through the procedures used and the probable value of any additional procedural safeguards. "The purpose of any presuspension hearing would be to assure that there are reasonable grounds to support the suspension without pay." (*Bostean*, *supra*, 63

28

Cal.App.4th at p. 113.)  Thus, we consider whether the City had
" ' "substantial assurance that the deprivation [was] not baseless
or unwarranted" ' " before placing Kilpatrick on unpaid leave
without a hearing (*id.* at pp. 112–113), and whether there existed
"risk of an erroneous deprivation through the procedures used."
(*Id.* at p. 114.)

The issues before the City were whether Kilpatrick was
vaccinated or willing to become vaccinated, and whether he had
timely requested a medical or religious exemption.  It is
undisputed in the appellate record before us that Kilpatrick was
not vaccinated and had failed to submit a request for religious
exemption by the deadline set forth in the Ordinance and LBFO.
Kilpatrick was given 48 hours to sign the Notice, which would
allow him to come into compliance by December 18 if he agreed to
the Notice's terms.  He declined to do so.  Had Kilpatrick received
the Notice despite being fully vaccinated or submitting a request
for an exemption, he had 48 hours to alert the City of any error.
It is unclear what information relevant to compliance with the
LBFO could not be gathered and submitted within 48 hours, and
Kilpatrick fails to identify any.  Under the circumstances, we
conclude the City had substantial assurance that the deprivation
was not baseless or unwarranted.

*Gilbert* supports this conclusion.  In *Gilbert*, the plaintiff
was a university police officer who was arrested in a drug raid
and charged with several drug-related offenses, including one
felony.  (*Gilbert, supra,* 520 U.S. at pp. 927–928.)  Upon learning
of the arrest and charges, the university immediately suspended
the plaintiff without pay.  (*Id.* at p. 927.)  The plaintiff learned of
his suspension the day after his arrest.  He received a letter that
same day confirming his suspension pending an investigation

29

into the charges against him.  (*Ibid*.)  Although the criminal charges were dismissed, the plaintiff's suspension remained in effect while the university continued its investigation.  (*Ibid*.)  Approximately three weeks after the plaintiff was suspended, university officials met with him to provide him an opportunity to give his side of the story.  (*Ibid*.)  The following week, the plaintiff was demoted to a groundskeeper position as a result of his admission that he maintained associations with individuals he knew were dealing in large quantities of marijuana.  (*Id*. at pp. 927–928.)  The following day, a meeting took place at which the plaintiff received and read the police report containing his alleged confession, which he had not previously seen.  (*Id*. at p. 928.)  After the plaintiff was given an opportunity to respond to the charges, the president of the university sustained the demotion.  (*Ibid*.)

The Court of Appeals adopted a categorical prohibition against the suspension of a governmental employee without pay " 'unless that suspension is preceded by some kind of pre-suspension hearing, providing the employee with notice and an opportunity to be heard.' "  (*Gilbert, supra*, 520 U.S. at p. 930.)  But the United States Supreme Court rejected this conclusion.  Turning to the three balancing factors, the Supreme Court noted the plaintiff had faced only a temporary suspension without pay and "the State has a significant interest in immediately suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers."  (*Id*. at p. 932.)  The Court rejected the argument that "this interest in maintaining public confidence could have been accommodated by suspending him *with* pay until he had a hearing," as "the Constitution does

30

not require the government to bear the added expense of hiring a replacement while still paying" an employee charged with a felony. (*Ibid*.)

Finally, the court observed that "the purpose of any pre-*suspension* hearing would be to assure that there are reasonable grounds to support the suspension without pay" and "that has already been assured by the arrest and the filing of charges." (*Gilbert*, *supra*, 520 U.S. at pp. 933, 934.) Although "there is more reason to believe an employee has committed a felony when he is indicted rather than merely arrested and formally charged," the court concluded the arrest and charge were sufficient because they "serve to assure that the state employer's decision to suspend the employee is not 'baseless or unwarranted'. . . . " (*Id*. at p. 934.)[5]

In both *Gilbert* and the instant case, significant government interests prompted the suspensions without pay. In *Gilbert*, it was an interest in maintaining public confidence in the police force. Here, among other things, it was "the imminent threat to public health and safety and workplace safety posed by allowing unvaccinated City employees to remain in the workplace and to continue to interact with the public and other City

---

[5] The *Gilbert* court ultimately remanded the case to the Court of Appeals to determine whether the plaintiff had been accorded a sufficiently prompt post-suspension hearing. (*Gilbert*, *supra*, 520 U.S. at pp. 935–936.) This decision was based in part on the fact that the criminal charges had been dropped but the suspension remained in effect. Therefore, "the risk of erroneous deprivation increased substantially." (*Id*. at p. 935.) Here, the record does not indicate that anything occurred between Kilpatrick's placement off duty and his *Skelly* hearing to suggest an increased risk of erroneous deprivation.

employees." Although there were no criminal charges in this case, the City, like the university in *Gilbert*, had assurance that its decision to suspend Kilpatrick was not baseless or unwarranted. There is no dispute presented in the record on appeal that Kilpatrick was not vaccinated, had not requested a religious exemption, and had not agreed to comply with the City's vaccine mandate. There is also no dispute that the City was aware of these facts at the time it placed Kilpatrick on leave without pay.

*Bostean* also provides a helpful contrast. In that case, the plaintiff, a school district employee suffering from diabetes and epilepsy, was placed on involuntary illness leave without pay for seven months. (*Bostean*, *supra*, 63 Cal.App.4th at pp. 99–101.) Before placing him on leave, the plaintiff's supervisor made inquiries to the plaintiff's physician, but neither the plaintiff nor his physician had "prior notice that [these] queries to his physician about his medical limitations were actually preliminary to an involuntary illness leave of absence, as opposed to efforts to attempt to accommodate his medical conditions or to ameliorate alleged unsafe work conditions." (*Id*. at p. 114.)

The plaintiff also had no predeprivation opportunity to be heard. He was told on the last business day before his leave was scheduled to begin that his employer would be relying on the medical information it had obtained to place him on leave. (*Bostean*, *supra*, 63 Cal.App.4th at p. 115.) The Court of Appeal concluded "[t]he risk of miscommunication, misinterpretation, and factual error is extremely great in such circumstances . . . ." (*Ibid*.) This was illustrated by the fact the plaintiff's supervisors, who were "not medical practitioners, had great difficulty interpreting" a report received from the plaintiff's physician.

(*Ibid*.)  Thus, the procedures the employer used were not reliable for "developing reasonable grounds to support the imposition of an involuntary illness leave of absence without prior notice and hearing." (*Id*. at p. 116.)

In *Bostean*, there was "no explanation in [the] record as to why District stopped 'informally accommodating' [the employee] . . . and placed him on illness leave of absence" without pay *and* "no evidence in the . . . record that [his] remaining on his job posed any immediate threat to his health and safety or that of any other person." (*Bostean*, *supra*, 63 Cal.App.4th at pp. 113–114.)  In contrast, here, the City's countervailing interests and the need for immediate action were set forth clearly in the resolution adopting the LBFO.  The "risk of miscommunication, misinterpretation, and factual error" was low. (*Id*. at p. 115.)  No medical knowledge was required to interpret Kilpatrick's vaccination status or whether he had sought an exemption.

Unlike the employees in *Gilbert* and *Bostean*, Kilpatrick received notice of the charges against him and had a short period to respond prior to being temporarily removed from duty.  He received further post-suspension notice and the opportunity to be heard and respond in real time less than six weeks later.  Under the circumstances of this case, and considering the three distinct factors necessary to determine what process was constitutionally due, we conclude the City's procedure was constitutionally sufficient.  Kilpatrick received the "predisciplinary procedures otherwise required by law" pursuant to section 1060(b).

33

## DISPOSITION

The judgment is reversed.  The trial court is directed to enter a new order denying Kilpatrick's petition for writ of mandate in its entirety.  The City shall recover its costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EGERTON, Acting P. J.

BERSHON, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.